**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MIKAL HASLAM, | ) | CASE NO. 5:18CV1582 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Mikal Haslam ("Plaintiff" or "Haslam"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Child's Insurance Benefits ("CIB"), Period of Disability ("POD"),

Disability Insurance Benefits ("DIB"),[2] and Supplemental Security Income ("SSI") under Titles

II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to

28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.    PROCEDURAL HISTORY

In October 2015, Haslam filed applications for CIB, POD, DIB, and SSI, alleging a

disability onset date of April 11, 1994 and claiming he was disabled due to learning disability,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2] Haslam's application for POD and DIB was for Medicare only.  (Tr. 11.)

1

depression, and difficulty sleeping. (Transcript ("Tr.") at 11, 362.) The applications were denied initially and upon reconsideration, and Haslam requested a hearing before an administrative law judge ("ALJ"). (Tr. 11.)

On September 14, 2017, an ALJ held a hearing, during which Haslam, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 29-51.) On November 15, 2017, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 11-28.) The ALJ's decision became final on May 7, 2018, when the Appeals Council declined further review. (Tr. 1-5.)

On July 11, 2018, Haslam filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15, 16.) Haslam asserts the following assignments of error:

(1)     The ALJ erred in failing to find that Plaintiff met/equaled Listing 12.05B. This finding lacks the support of substantial evidence because Plaintiff had significantly subaverage general intellectual functioning evidenced by a full scale IQ score of 70 or below, significant deficits in adaptive functioning currently manifested by marked limitations in two areas of mental functioning, and evidence regarding both Plaintiff's current intellectual and adaptive functioning and history of his disorder demonstrated the conclusion that the disorder began prior to his attainment of age 22.

(2)     The ALJ erred in assigning limited weight to the opinion of Dr. Anil Parikh, M.D., Plaintiff's treating psychiatrist. This finding lacks the support of substantial evidence because the record as a whole, including, but not limited to, objective observations from mental status examinations, Plaintiff's ongoing subjective complaints, Plaintiff's testimony, and school records support the opinion of Dr. Parikh.

(Doc. No. 13.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Haslam was twenty-three (23) years-old at the time of his administrative hearing, making him a "younger" person under social security regulations. (Tr. 21.) *See* 20 C.F.R. §§ 404.1563 & 416.963. He has a high school education and is able to communicate in English. (*Id.*) He has past relevant work as a janitor. (*Id.*)

**B.** **Relevant Evidence[3]**

**1.** **School Records**

The record reflects an Individualized Education Plan ("IEP") was implemented for Haslam on January 20, 2000, when he was five years old and in kindergarten. (Tr. 598-603.) It was noted Haslam had difficulties with communication skills and basic class work. (Tr. 599.) In particular, Haslam's teachers noted that "the Test of Minimal Articulation Competence showed profound severity," explaining Haslam "had difficulty with substitutions and omissions of numerous sounds." (*Id.*) Haslam was found to be eligible for speech therapy services. (Tr. 601.)

An IEP review was conducted on January 11, 2001, when Haslam was in the first grade. (Tr. 590-597.) His teachers noted (in relevant part) as follows:

> Mikal has primarily worked on improving speech intelligibility. . . . He is using sounds correctly in short, structured sentences about 50% of the time. Progress has been slow with little carryover into spontaneous conversation. In addition, there appears to be language difficulties as well but standardized testing is difficult due to his intelligibility. Mikal has academic problems in class.

(Tr. 590.) Several months later, in May 2001, an Evaluation Team Report ("ETR") was completed, as a part of which Haslam underwent a number of assessments. (Tr. 486-504.)

---

[3] The Court's recitation of the evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Among other things, Haslam was administered the Wechsler Intelligence Scale for Children-Third Edition, in order to assess his cognitive functioning. (Tr. 488-489.) The record reflects Haslam scored a Full Scale IQ of 70, placing him in the 2nd percentile. (Tr. 488.) His level of intellectual functioning was determined to be within the Borderline range. (*Id.*)

Haslam also underwent the Woodcock Johnson III Tests of Achievement to evaluate his academic performance. (Tr. 490-491.) The results of this test found Haslam's performance was in the low to very low range. (*Id.*) The ETR noted Haslam was able to recognize some of his upper and lower case letters, but was unable to read sight words such as "cat" and "on." (*Id.*) In terms of his math skills, he was able to do some basic addition problems but had difficulty with simple subtraction. (*Id.*)

Lastly, Haslam underwent the Behavior Assessment System for Children ("BASC"). (Tr. 493-494.) This test indicated elevated scores in the area of school problems (i.e., learning problems), as well as "concerns in the areas of somatization, leadership, and study skills" and in "the Adaptive Skills Composite areas of withdrawal and leadership." (*Id.*) It was noted that Haslam did "not readily describe inner experiences related to emotion" and was "rather tense" "with considerable hostility arising from his competitive sensitivities towards peers." (*Id.*) The examiner, school psychologist Katrina Jordan, Ed.S., concluded that Haslam's "social/emotional status may negatively affect his educational performance." (*Id.*)

As part of this ETR, Haslam's speech pathologists submitted an evaluation, in which they noted Haslam's "articulation skills are . . . significantly below those of his typically developing peers" and found his "speech is unintelligible to most listeners." (Tr. 496.) It was concluded Haslam would benefit from a "significantly adjusted curriculum with major emphasis on

functional living skills." (Tr. 498.) The school district determined Haslam had a disability, which was identified as "Mental Retardation (Developmental Handicap)." (Tr. 499.)

On May 14, 2001, an IEP was developed for Haslam for the following school year. (Tr. 610-619.) Therein, Haslam's speech pathologists noted Haslam had shown progress since his last IEP but "continue[d] to have difficulty using and recalling vocabulary words." (Tr. 611.) Haslam's teachers also noted he had difficulty (1) reading on a kindergarten or first grade level; (2) adding and subtracting grade appropriate math problems; (3) writing 6 or more letters words and writing a simple sentence; and (4) knowing his right from left. (Tr. 613.) It was also observed that Haslam "require[d] much one on one assistance from the teacher." (*Id.*) Haslam was found eligible for special services, including extended time for tests and assignments, a reader, selective seating, individualized instruction, and speech therapy. (Tr. 619.)

An IEP review was thereafter conducted in April 2002, when Haslam was in the second grade. (Tr. 620-636.) Of particular relevance, Haslam's teachers noted as follows:

> Mikal's speech at the conversational level is most often unintelligible especially to unfamiliar listeners. . . . Mikal's vocabulary skills are still below age/grade level due to difficulties with recall skills. Mikal has difficulty with many phonological skills that interfere with reading and articulation skills in the classroom. Speech and language intervention is necessary for Mikal to improve the above speech and language areas.

(Tr. 630.) Haslam was found eligible for special services, including individual and small group instruction, as well as intervention specialist assistance. (Tr. 635.) On April 15, 2002, the school district found Haslam had a disability, which was identified as "Mental Retardation (DH)." (Tr. 604-605.) It was determined he would receive education in a regular class room with special education/related services provided outside the regular class at least 21% and no more than 50% of the time. (*Id.*)

Another IEP review was conducted on March 26, 2003, when Haslam was in the third grade.  (Tr. 656-676.)  His teachers found Haslam was "presently functioning at a 1st grade level in reading, written language and mathematics."  (Tr. 656.)  They also noted he "tries to do everything and is a joy to have in class."  (*Id.*)  At this time, Haslam's speech was "still difficult to understand due to a severe phonological disorder."  (Tr. 666.)  His vocabulary skills were also below age/grade level.  (*Id.*)  Haslam continued to be found eligible for special services, including speech therapy.  (Tr. 673.)  The school district again found Haslam had a disability, which was identified as "Mental Retardation (DH)."  (Tr. 643-644.)  It was determined he would receive education in a regular class room with special education/related services provided outside the regular class for less than 21% of the time.  (*Id.*)

An ETR was completed on April 1, 2004, when Haslam was in the fourth grade.  (Tr. 542-567.)  Haslam's disability condition was identified as "Cognitive Disability."  (Tr. 544.)  As part of this ETR, Haslam underwent intelligence testing, which revealed a Full Scale IQ of 71.  (Tr. 545.)  This score placed him in the borderline range of intelligence.  (*Id.*)  Haslam was also administered the Woodcock Johnson III Tests of Achievement, which measured his academic performance.  (Tr. 547-548.)  The results of this test were summarized as follows:

> Results indicate that Mikal's academic performance is currently low in math and math calculation skills[,] and very low in reading, written language and written expression.  Mikal was able to recognize his letters and to also decode many one syllable sight words.  In his math skills, Mikal was able to compute addition problems in the horizontal position.  He had difficulty subtracting one digit numbers and adding and subtracting numbers in the vertical position.  In his writing skills, Mikal was able to correctly write his name and made earnest attempts to write sentences independently. However, he was unable to write a short sentence when given a picture and three words. Mikal has difficulty using correct grammar and correct spelling when writing his sentences.

(Tr. 547-548.)  Haslam's teachers also noted that he was below grade level in reading, writing, and mathematics.  (Tr. 549-551.)

With regard to his speech and language skills, the ETR noted that "current language testing revealed that Mikal continues to have deficits in both receptive and expressive language and his skills are well below the skills of his same age/grade peers."  (Tr. 553-555.)   It was also noted that Haslam was "extremely difficult to understand," and that he had begun to display dysfluencies in his conversational speech.  (Tr. 553-554.)  Behavioral testing found limitations in several adaptive skill areas, including social skills, leadership, and study skills.  (Tr. 555, 557, 564.)

Another ETR was completed in March 2007, when Haslam was in the sixth grade.  (Tr. 512-528.)  The Report noted that Haslam received special education services, including math and language arts instruction "within a cross-categorical special education class."  (Tr. 519.)  His most recent grades were Bs in math and language arts; a B- in science, and a C- in social studies.  (*Id*.)  Performance testing was conducted on March 16, 2007, which showed Haslam was at a below second grade level in reading and math.  (Tr. 522-523.)  He was exempted from participation in the Fourth Grade Ohio Proficiency Test and Fourth Grade Achievement Test.  (Tr. 519.)  The school psychologist, Michelle Hathorn, noted Haslam was a "very, very low functioning student."  (Tr. 524.)  She stated he "demonstrates very poor intelligibility in his conversations," and "has a very difficult time in the area of reading."[4]  (*Id*.)

_____

[4] Ms. Hathorn explained that, based on language testing conducted the previous year, Haslam scores were as follows: "0/30 correct on the spelling portion, 0.3 fluency (not even first grade), and 1st grade 8th month in reading comprehension."  (Tr. 524.)

The next ETR was completed in March 2013, when Haslam was in the twelfth grade. (Tr. 442-469.) The Report noted that, on April 5, 2012, Haslam's reading comprehension was assessed and found to be at a 3rd grade level. (Tr. 446.) It further stated that, in October 2012, Haslam again underwent intelligence testing, which revealed a Full Scale IQ of 69. (Tr. 446-447.) At that same time, Haslam's adaptive behavior was assessed and found to be below average in multiple areas, including communication, social functioning, community use, functional academics, health and safety, and use of leisure time. (Tr. 452, 447.) Evaluators noted that Haslam "continues to exhibit significantly below average general intelligence, academic skills and adaptive behavior relative to other individuals of the same age." (Tr. 448.) The results of the ETR were summarized as follows:

> Mikal Haslam is an 18 year old, 12th grade student . . . He was previously identified as a student with a Cognitive Disability when he was 6 years old and has been receiving specially designed instruction throughout his educational career. Mikal's general intelligence, academic skills, and adaptive behavior was most recently formally assessed in October 2012. Results of that evaluation were very consistent with past testing. His general intelligence was measured to be within the borderline, or below average range, as compared to other students of the same age. . . . . Commensurate with his intellectual functioning, Mikal's academic skills were measured to be significant[ly] below average as compared to other students of the same age. School functioning also indicates that he is performing below age and grade level expectations in the classroom. He requires specially designed math and reading instruction and accommodations in the general education setting. Finally, Mikal's overall adaptive skills were deficit in multiple areas including communication, social functioning, community use, functional academics, health and safety and use of leisure time.

> Mikal is currently employed as a custodial assistant at Firestone High School. He likes his job and is described by his supervisors as a great asset to the custodial staff at Firestone. He gets along well with teachers and other staff. He gets along well with other students as well. Mikal is able to perform many daily self-help skills independently including dressing, getting to school, cooking and eating. He [is] uncertain at this time as to where he will live once he has graduated from high school.

(Tr. 452.)

Haslam's final twelfth grade report card showed that he graduated with a GPA of 3.014. (Tr. 435.) He was excused from the consequences of not passing the Ohio Graduation Test. (Tr. 445.)

### 2. Medical Records

On March 31, 2014, Haslam established treatment with psychiatrist Anil Parikh, M.D. (Tr. 734-738.) He complained of depression, anxiety, insomnia, decreased energy, social isolation, feelings of guilt, irritability, poor memory or concentration, and decreased motivation. (Tr. 734.) On examination, Haslam was cooperative with soft speech; a depressed, anxious, and blunted mood/affect; normal memory, and fair judgment and insight. (Tr. 737.) Dr. Parikh diagnosed major depressive disorder, single episode, moderate; and generalized anxiety disorder. (*Id*.) He assessed a Global Assessment of Functioning[5] ("GAF") of 55, and prescribed Celexa. (Tr. 737-738.)

The record reflects, in 2014, Haslam presented regularly to Dr. Parikh, certified nurse practitioner Julie Berg, C.N.P., and counselors Angela Sipos, M.A., Ed., P.C., and Julie Levine, L.P.C.C. (Tr. 717-723.) He complained of depressed mood, insomnia, fluctuation in weight and appetite, difficulty concentrating, fatigue, anxiety, and decreased motivation. (*Id.*) Haslam also

---

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

reported social isolation, mood swings, irritability, and panic attacks. (Tr. 721, 719.) Examination findings generally revealed cooperative behavior, good eye contact, coherent and relevant speech, depressed and anxious mood, blunted affect, intact thought processes, no loose associations, fair concentration and attention, fair memory, and fair judgment and insight. (Tr. 717-723.) In addition, in April 2014, Ms. Levine noted Haslam "appeared to have cognitive deficits/lower intellectual functioning, and therefore difficulties expressing himself in therapy." (Tr. 723.)

Haslam's mental health symptoms fluctuated during 2014. Initially, he reported increased depression associated with various stressors, including not having a girlfriend and wanting to attend college. (Tr. 723.) In April and July 2014, he reported his medication was helping with his symptoms. (Tr. 722, 723.) In September, he indicated he had not taken his Celexa "for about a month now" and was "having some difficulty with depression [and] isolating himself." (Tr. 721.) After he restarted his medication, Haslam denied depressive symptoms and reported he was "feeling better." (Tr. 720, 718.) He also began to report increased socialization and motivation, noting he had plans to go bowling, to the movies, and on a date. (Tr. 720, 718, 717.) In November 2014, Ms. Levine noted that "medications have helped eliminate symptoms of anxiety/depression, and he appears to be coping and handling life stressors." (Tr. 718.)

Haslam continued to treat regularly with Dr. Parikh, Ms. Berg, Ms. Levine, and Ms. Sipos in 2015, and also presented to counselors Jessica Silvestri, M.S.Ed., and Amanda Lorkowski, P.C. (Tr. 703-716.) With some exceptions, examination findings were largely the same as the previous year, including calm and/or cooperative behavior, good eye contact, coherent and relevant speech, depressed and anxious mood, blunted or restricted affect, intact

thought processes, no loose associations, fair concentration and attention, fair or intact memory, and fair judgment and insight. (*Id.*) In April 2015, however, Dr. Parikh noted poor eye contact, poor grooming, and poor concentration and attention. (Tr. 711.) In June 2015, Ms. Berg and Ms. Levine noted Haslam had "difficulties with his speech and comprehension." (Tr. 709.) In November 2015, Dr. Parikh noted Haslam's mood was "very depressed" and his concentration and attention were poor. (Tr. 704.)

Treatment records again reveal Haslam's depression and anxiety fluctuated over the course of the year. In January and February 2015, he reported his medication was helping to alleviate his symptoms, and expressed enthusiasm over a new girlfriend. (Tr. 714, 715.) In March, Haslam reported "difficulty with anxiety and worry regarding day to day activities and responsibilities," but noted his "concentration has improved." (Tr. 714.) Later that month, and in April, he discussed how his "lack of friends, hobbies and pleasures in life" exacerbate his depression symptoms, but nonetheless reported his medication was helping to reduce symptoms. (Tr. 713, 712.) In May 2015, Haslam shared that he was bullied frequently while in school, and discussed that "past bullying is why [he] is quiet and will not make an effort to talk to people." (Tr. 710.) In June and July, he complained of difficulty sleeping and "drama" both at home and at work. (Tr. 708.) Dr. Parikh prescribed Trazodone, and then increased the dosage of that medication in September when Haslam continued to complain of insomnia. (Tr. 708, 707.) In October, Haslam generally reported his medication was helping to reduce his symptoms. (Tr. 706, 705.) However, in November 2015, he described a "low mood" and reported his medications had not eliminated his symptoms. (Tr. 704.) In December, Ms. Levine noted Haslam appeared distressed, had a blunted affect, and was "minimally responsive." (Tr. 703.)

In 2016, Haslam presented to Dr. Parikh, Ms. Levine, Ms. Silvestri, counselor Jillian Newland, L.P.C., certified nurse practitioner Sandra Jones, C.N.P., and social worker Manon Paquet, L.I.S.W. (Tr. 724-727, 730-733, 748.) Examination findings were largely the same as the previous two years, including calm and/or cooperative behavior, good or appropriate eye contact, coherent and relevant speech, depressed and anxious mood, blunted or restricted affect, intact thought processes, no loose associations, fair concentration and attention, fair or intact memory, and fair or (sometimes) good judgment and insight. (*Id.*) In February 2016, Haslam "denied recent issues with anxiety/depression sharing medications have stabilized his symptoms. (Tr. 726.) The following month, however, he reported insomnia, irritability, poor concentration, anticipatory anxiety, feeling overwhelmed with worry, and difficulty with hopefulness and self-worth. (Tr. 725.) Ms. Newland noted Haslam "continues to perseverate on chronic pain difficulties and limitations in abilities." (*Id.*)

In May 2016, Haslam reported his symptoms were worsening. (Tr. 733.) Later that month, he reported some improvement in mood and coping with stress, but stated he continued to experience irritability, low-frustration tolerance, poor concentration, and perseverative worries. (Tr. 732.) In June, Ms. Silvestri noted Haslam "feels treatment has been helping to decrease frequency and severity of symptoms and improve hopefulness," but "acknowledge[s] ongoing anxiety and fearfulness of never feeling fully healthy and happy again." (*Id.*) In September 2016, Haslam indicated he was "doing well on his medications."[6] (Tr. 731.) In October, however, he stated he had "no motivation to do anything other than working, eating &

---

[6] It is not entirely clear from Haslam's treatment notes which medications he was taking. Some of Haslam's records indicate he was taking Celexa and Trazodone, while others state he was taking Zoloft and Remeron. *See e.g.* Tr. 731.

sleeping." (Tr. 730.) The following month, Haslam indicated his medications were "working well" and reported he was trying to get a full time position at his job. (Tr. 748.)

On April 26, 2017, Haslam had a calm, quiet demeanor; restricted affect; and intact memory. (Tr. 747.) Ms. Levine described him as "minimally responsive." (*Id.*) The following month, he returned to Dr. Parikh and reported he only took his medications on weekends. (*Id.*) Dr. Parikh noted depressed mood, blunted affect, appropriate eye contact, fair attention and concentration, fair memory, and good judgment and insight. (*Id.*) He advised Haslam to take his medications as prescribed. (*Id.*) Later that month, Haslam stated he was taking his medication as prescribed, but continued to complain of insomnia and poor motivation. (*Id.*) On June 21, 2017, Haslam again had a restricted affect and was minimally responsive. (Tr. 746.)

On June 2, 2017, Dr. Parikh completed a Medical Source Assessment regarding Haslam's mental functioning. (Tr. 740-742.) Therein, he opined Haslam would have "noticeable difficulty (distracted from job activity) more than 20% of the work day or work week (i.e., more than one hour and up to two hours/day or one-half to one day/week)" performing the following activities: (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; and (3) interacting appropriately with the general public. (*Id.*) Dr. Parikh further found Haslam would not be able to perform the following activities on a regular, reliable and sustained schedule:

- Understanding, remembering, and carrying out detailed instructions;

- Maintaining attention and concentration for extended periods of time;

- Performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances;

- Sustaining ordinary routine without special supervision;

- Working in coordination with or proximity to others without being distracted by them;

- Making simple, work-related decisions;

- Completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;

- Asking simple questions or requesting assistance;

- Accepting instructions and responding appropriately to criticism from supervisors;

- Getting along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness;

- Responding appropriately to changes in the work setting;

- Being aware of normal hazards and taking appropriate precautions;

- Traveling in unfamiliar places or using public transportation;

- Setting realistic goals or making plans independently of others.

(*Id*.)  Lastly, he concluded that, as a result of his impairments or treatment, Haslam would likely (1) be absent from work more than four days per month, (2) be off task over 20% of the workday, and (3) need to take unscheduled breaks more than four times per day, each lasting 15 to 30 minutes.  (Tr. 741.)

**C.    State Agency Reports**

On January 14, 2015, Haslam underwent a psychological consultative examination with Robert F. Dallara, Ph.D.  (Tr. 696-702.)  He complained of depression "here and there" for "years," as well as memory problems.  (Tr. 698.)  Haslam reported he was currently employed as

a cleaner and "denied difficulties completing his work, relating to others, or coping with work demands due to mental or emotional difficulties." (Tr. 697.) He stated he did not know if he would have difficulties working full time. (Tr. 696.)

On examination, Dr. Dallara noted Haslam was alert and oriented with adequate hygiene and grooming, and "marginally adequate" eye contact. (Tr. 697-698.) He stated Haslam "appeared to attempt to be cooperative but was only a fair informant and historian." (Tr. 697.) Haslam's speech was approximately 80% intelligible in a known context, and was nonspontaneous with normal rate and volume. (Tr. 698.) His thinking was "logical although somewhat superficial." (*Id.*) Haslam reported a depressed mood, and Dr. Dallara found his affect was appropriate to his thought content. (*Id.*) There was no evidence of anxiety, elevated mood, grandiosity, or bizarre behaviors. (Tr. 697-698.) With regard to Haslam's cognitive functioning, Dr. Dallara noted as follows:

> Mikal was alert and oriented as to time, place, person, and situation. He knew his age, birthday, and social security number. He denied hallucinations and there was no evidence of delusions, paranoia, dissociative experiences, obsessive-compulsive behaviors, or recurrent or intrusive recollections of a traumatic event. He reports some difficulties with his memory stating he forgets yesterday and will forget dates and has difficulties remembering conversations. He was able to slowly count backwards from 20 down to 1 as well as say the alphabet correctly. He was unable to count from 1 to 40 by threes, and did poor at serial subtraction. He could remember 4 digits forward and 2 reversed. He could recall 2 items out of 3 after a five-minute period. He was able to describe the similarities between an orange and banana, but unable to describe the similarities between an eye and ear or a boat and car. He knew the number of months in a year, the function of a thermometer, and was able to identify Martin Luther King. Overall his intelligence would be estimated to fall in the borderline range.

(Tr. 698.) Dr. Dallara found Haslam appeared to be dependent on his mother "in order to maintain himself in the community," and stated "he may be vulnerable to exploitation." (*Id.*) As

a result, he concluded that, if awarded benefits, Haslam would not be able to manage funds in his own best interest.  (Tr. 699.)

Dr. Dallara diagnosed depression and borderline intellectual functioning; and assessed an overall GAF of 55, indicating moderate symptoms.  (Tr. 698.)  In terms of the four broad mental functional areas, he opined as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

The claimant reports he graduated from Buchtel High School in 2013. He reports he was in regular classes; however records provided by DDS indicate he had special classroom placement. His [sic] during the examination suggests intellectual functioning in the borderline range. He would be expected to be able to understand and apply instructions in a work setting consistent with borderline intellectual abilities.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks, and to perform multi-step tasks.**

The claimant did not report a pattern of leaving work due to mental or emotional difficulties. There was no direct evidence during the examination to suggest impairment to his persistence or pace.  He was able to track the flow of conversation adequately during the examination and did not show easy distractibility.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

The claimant made an essentially unremarkable social presentation during the examination. No information was provided to suggest inappropriate comportment during his work history. However due to his depression and borderline intellectual functioning, he may have some difficulties relating to others including fellow workers and supervisors.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

The claimant reports he has been receiving outpatient psychiatric treatment from Dr. Parikh for the past year.  He did not report a pattern of inability to adjust to

workplace demands nor did he describe a history of mental or emotional deterioration in response to work exposure. However due to his depression and borderline intellectual functioning, he would have some difficulties withstanding stress and pressure associated with day-to-day activity.

(Tr. 699-700.)

On January 22, 2016, state agency psychologist Irma Johnston, Psy.D., reviewed Haslam's records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 70-73.) In the PRT, she concluded Haslam had mild difficulties in maintaining social functioning, moderate restrictions in his activities of daily living, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 70.) In the Mental RFC, Dr. Johnston found Haslam was moderately limited in his abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (5) respond appropriately to changes in the work setting. (Tr. 71-73.) In the narrative sections of the assessment, Dr. Johnston explained (in relevant part) as follows:

Clmt is capable of understanding and recalling simple, 1-3 step tasks. * * * Would benefit from routine tasks and occasional supervisory prompting to stay on task. He can adapt to a setting where there is no demand for a fast pace. Any changes should be infrequent in nature.

(Tr. 72-73.)

On March 5, 2016, state agency psychologist Cynthia Waggoner, Psy.D., reviewed Haslam's records and completed a PRT and Mental RFC Assessment. (Tr. 133-137.) Dr. Waggoner reached the same conclusions as Dr. Johnston. (*Id.*)

**D.     Hearing Testimony**

During the September 14, 2017 hearing, Haslam testified to the following:

- He lives with his mother and 37 year old brother.  (Tr. 34.)  He has never been married, and has no children.  (*Id.*)  He finished high school, but can only read "little words."  (Tr. 35.)  He does not drive because he "cannot read."  (Tr. 34-35.)

- He cannot work for the following reason: "I cannot understand what the words say and be hard for me to read it, to understand about what they're saying." (Tr. 36.)  He also suffers from depression and anxiety.  (Tr. 38-39.)  He takes medications for these conditions, which make him sleepy.  (Tr. 39-40.)

- He works five hours per day, five days per week as a janitor.  (Tr. 33.)  He got this job through his school.  (Tr. 36-37.)  He has worked in this position for the previous four years.  (Tr. 33.)  He has not held any other jobs or done any volunteer work.  (Tr. 33-34.)

- In his job, he cleans two bathrooms and a hallway, and then wipes the glass doors at the classrooms.  (Tr. 36.)  He does not have time to finish his other tasks such as cleaning the walls and floors, because he only has five hours.  (Tr. 36-37.)  He is supposed to be able to finish these tasks within a five hour time frame but it is not able to do so.  (Tr. 42.)  He took a test to see if he could work full time, but he failed it.  (*Id.*)

- When he is not working, he sits at home and watches TV or plays Xbox.  (Tr. 35.)  He washes the dishes and takes out trash.  (*Id.*)  His brother has to remind him to do his chores.  (Tr. 44.)  He needs help reading his mail.  (Tr. 42.)  He shares a bank account with his mother.  (Tr. 42-43.)  He can do "a little bit" of addition and subtraction, but his mother keeps track of their finances.  (*Id.*)

- He does not have friends because people irritate him and make him nervous.  (Tr. 35, 44.)  He had a girlfriend for five years but they broke up.  (Tr. 41.)  Sometimes he feels lonely and angry.  (Tr. 45.)  He cries when he thinks about his father.  (Tr. 43.)  He was bullied at school, and did not have any friends.  (Tr. 45-46.)

- Even if he was given the opportunity, he would not work more hours at his janitor job because his left leg gets very tired and he "just can't do it."  (Tr. 37-38.)  He can lift 20 pounds and has no problems with walking or sitting.  (Tr. 38.)  However, he has difficulty standing for too long because he has two bumps on his left leg.  (*Id.*)

18

The VE testified Haslam had past work as an institutional cleaner. (Tr. 46-47.) The ALJ then posed the following hypothetical question:

> My first hypothetical question if you could assume an individual with the same age, education, and work experience as the claimant. This individual would be able to work at all exertional levels. The individual could perform unskilled, SVP 1 to 2 work that's free of fast paced production requirements involving only routine workplace changes. The individual can have occasional public contact and occasionally do tasks with interaction to coworkers. * * * And he can have superficial contact with others, meaning that he can do no tasks involving arbitration, negotiation, confrontation, directing work of others, persuading others, or being responsible for the safety and welfare of others. Would such an individual be able to perform the claimant's past work?

(Tr. 47.) The VE testified the hypothetical individual would be able to perform Haslam's past work as an institutional cleaner, as well as other representative jobs in the economy such as landscape laborer (unskilled, SVP 2, heavy), dishwasher (unskilled, SVP 2, medium), and warehouse worker (unskilled, SVP 2, medium). (Tr. 48.)

The ALJ then asked a second hypothetical that was the same as the first but with the additional limitation that the individual would "need occasional supervisory prompting to stay on task." (Tr. 48.) The VE testified that: "I think if a person needs 30% of the time supervisory prompting, I don't think that's consistent with competitive employment. I think if the person required 10% prompting, I think that's consistent with sustaining competitive employment based on my professional training and experience in job placement and retention." (*Id.*)

The ALJ then asked the VE about employer tolerance for off task behavior. (Tr. 49.) The VE testified "a person could be off task no more than 10% to sustain competitive employment." (*Id.*) With regard to absences, the VE testified employers would not tolerate more than one absence per month. (*Id.*) Finally, with regard to unscheduled breaks, the VE testified

there would be no competitive employment for an individual that required more than four unscheduled breaks per day each lasting between 15 and 20 minutes.  (*Id.*)

## III.  STANDARD FOR DISABILITY

The Social Security Act mandates the satisfaction of three basic criteria to qualify for child's insurance benefits of an insured, namely, the child must: (1) have filed an application for such benefits; (2) have been unmarried at the time of the filing and must have been either: (i) under eighteen years of age or a full time elementary or secondary school student under nineteen, or (ii) under a disability which began before age 22; and (3) have been dependent upon the parent at the time the application was filed if the parent is still living or, if the parent is deceased, at the time of the parent's death.  42 U.S.C. § 402(d)(1).

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[7] 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits,

---

[7] The Child's Insurance Benefits and SSI regulations are generally identical.  *See Peshe v. Comm'r of Soc. Sec*., 2015 WL 6437216 at fn 2 (N.D. Ohio Oct. 22, 2015).

a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Haslam was insured on his alleged disability onset date, April 11, 2014, and remained insured for Medicare coverage through June 30, 2017, his date last insured ("DLI.")

(Tr. 11-12.)  Therefore, in order to be entitled to POD and DIB (Medicare only), Haslam must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      [T]he claimant had not attained age 22 as of April 11,1994, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).

2.      The claimant was insured for Medicare coverage through June 30, 2017.

3.      The claimant engaged in substantial gainful activity during the following periods: 4th Quarter 2015 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b), and 416.971 et seq.).

4.      However, there has been a continuous 12 month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

5.      Prior to attaining age 22 and presently, the claimant had the following severe impairments:  Affective disorder/depression and Borderline intellectual functioning (20 CFR 404.1520(c)).

6.      Prior to attaining age 22 and currently, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.925 and 416.926).

7.      After careful consideration of the entire record, I find that, prior to attaining age 22 and presently, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform unskilled (SVP 1-2) work.  The work environment must be free of fast-paced production requirements and routine work place changes.  The claimant can have occasional public contact and can do tasks with occasional interaction with coworkers.  The claimant can have superficial contact with others, in that he

can do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety of others.

8.      Prior to attaining age 22, the claimant was capable of performing past relevant work as a janitor, school cleaner-institutional, DOT 381.687-014, SVP 2, heavy.  This work does not require the performance of work-related activities precluded  by the claimant's residual functional capacity (20 CFR 404.1565 and  416.965).

9.      The claimant has not been under a disability, as defined in the Social Security Act, at any time prior to . . . the date he attained age 22 (20 CFR 404.350(a)(5) and 404.1520(1)).  The   claimant has not been under a disability, as defined in the Social Security Act, from April 11, 1994, through the date of this decision (20 CFR  404.1520(1) and 416.920(1)).

(Tr. 11-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

23

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

*Listing 12.05B*

In his first assignment of error, Haslam argues the ALJ erred in finding he did not meet or equal the requirements of Listing 12.05B for intellectual disorders. (Doc. No. 13 at 16-20.) Citing his school records and abnormal mental status examination findings, he maintains he "met all requirements under Listing 12.05B, as he had significantly subaverage general intellectual functioning and significant deficits in adaptive functioning manifested by marked limitations under the areas of (1) understanding, remembering, or applying information; and (2) concentrating, persisting, or maintaining pace." (*Id*. at 17.) In particular, Haslam argues the ALJ improperly relied on his alleged ability to perform activities of daily living in determining he did not have significant deficits in adaptive functioning, arguing "an individual does NOT have to be incapable of performing any activities of daily living" to satisfy this portion of the listing. (*Id*. at 20.) Haslam further asserts the ALJ mischaracterized his alleged ability to live independently, noting testimony that he relies heavily on his mother. (*Id*.)

The Commissioner argues substantial evidence supports the ALJ's finding that Haslam has only moderate limitations in the areas of understanding, remembering, or applying information; and concentrating, persisting, or maintaining pace. (Doc. No. 15 at 14-16.) With

regard to the former, she notes the "medical record did not mention any issues with Plaintiff's short or long term memory" and argues Haslam could perform simple maintenance, prepare meals, go to doctor's appointments, and play games. (*Id*. at 15.) With regard to Haslam's ability to concentrate, persist, or maintain pace, the Commissioner asserts "the record fails to show any mention of problems with distractibility." (*Id*.) She further notes that mental status exams generally found Haslam's attention and concentration were fair and his thought processes were intact. (*Id*.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria,

no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011); *Brauninger v. Comm'r of Soc. Sec.*, 2019 WL 2246791 at * 5 (6th Cir. Feb. 25, 2019). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

Here, at step two, the ALJ determined Haslam suffered from the severe impairments of affective disorder/depression and borderline intellectual functioning. (Tr. 14.) The ALJ then proceeded at step three to find Haslam did not meet or equal the requirements of Listing 12.05. (Tr. 14-16.) As the regulations explain, Listing 12.05 "has two paragraphs, designated A and B, that apply to only intellectual disorder." 20 CFR Part 404, Subpt P, App. 1, § 12.00A(3). Each paragraph requires that the claimant have significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and evidence that demonstrates or supports (is consistent with) the conclusion that his/her disorder began prior to age 22. *Id*.

Haslam argues the ALJ erred in determining he did not meet or equal the requirements of Listing 12.05B, which provides as follows:

12.05 Intellectual disorder (see 12.00B4), satisfied by A or B:

\* \* \*

B.      Satisfied by 1, 2, and 3 (see 12.00H):

1.      Significantly subaverage general intellectual functioning evidenced by a or b:

      a.  A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

      b.  A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2.      Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

      a. Understand, remember, or apply information (see 12.00E1); or

      b. Interact with others (see 12.00E2); or

      c. Concentrate, persist, or maintain pace (see 12.00E3); or

      d. Adapt or manage oneself (see 12.00E4); and

3.      The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 CFR Part 404, Subpart P, App. 1, § 12.05B.

At step three, the ALJ determined Haslam had significantly subaverage general intellectual functioning pursuant to § 12.05B1, but found he did not have significant deficits in adaptive functioning pursuant to § 12.05B2 because he had no more than moderate impairment in the four specific areas of mental functioning listed above. (Tr. 16.) Specifically, the ALJ determined (in relevant part) as follows:

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.05. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

**In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant alleged that he has difficulty remembering generally, understanding what is said to him, following instructions, completing tasks, and paying bills. However, the claimant also stated that he could perform simple maintenance, prepare meals, go to doctor's appointments, take medications, and play games. In addition, the record shows that the claimant was able to provide information about his health, describe his prior work history, follow instructions from healthcare providers, respond to questions from medical providers, and there is any mention of any issues with the claimant's short- or long-term memory.**

In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that he has difficulty engaging in social activities and getting along with others. However, according to his statements, the claimant is also able to get along with others, spend time with friends and family, deal appropriately with authority, and live with others. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, and had good interactions with non-medical staff.

**The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that he has limitations in concentrating generally, reading, focusing generally, and following instructions. On the other hand, the claimant said that he is also able to drive, prepare meals, watch TV, play games, and handle his own medical care. Additionally, the record fails to show any mention of distractibility.**

Finally, the claimant has moderate limitations in his ability to adapt or manage himself  The claimant asserted that he has difficulties managing his mood. That said, the claimant also stated that he is able to handle self-care and personal hygiene.  Meanwhile, the objective evidence in the record showed the claimant to have

appropriate grooming and hygiene, no problem getting along well with providers and staff, and no problems with temper control.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

\* \* \* \*

Turning back to listing 12.05 . . . In this case, the[] requirements [of Listing 12.05B] are not met because, although the claimant has subaverage general intellectual functioning, he does not have significant deficits in adaptive functioning, as he has no more than moderate impairment in the above areas of mental functioning, as discussed above.

(Tr. 14-16) (emphasis added).

Haslam argues remand is required because the ALJ erred in finding he did not have significant deficits in adaptive functioning. The regulations explain that "[a]daptive functioning refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands." 20 CFR Part 404, Subpt P, App. 1 at § 12.00H3a. Under § 12.05B2, the Agency will "identify significant deficits in adaptive functioning based on whether there is extreme limitation of one, or marked limitation of two, of the paragraph B criteria." *Id.* As the ALJ notes, to establish a "marked" limitation, the claimant's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively." *See Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Harvard v. Comm'r of Soc. Sec.*, 2015 WL 506976 at \* 14 (N.D. Ohio Feb. 6, 2015).

Here, Haslam maintains the ALJ improperly found he had a less than marked limitation in the areas of (1) understanding, remembering, or applying information; and (2) concentrating, persisting, or maintaining pace. As it is dispositive, the Court will begin with a discussion of the ALJ's findings with regard to Haslam's degree of limitation in the area of concentrating, persisting, or maintaining pace.

The regulations discuss the category of concentration, persistence, or pace, as follows:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(3).

The Court finds substantial evidence supports the ALJ's determination that Haslam has a moderate restriction in concentration, persistence, and pace. As the ALJ notes (at both steps three and four),[8] treatment records do not document significant difficulties with distractibility or concentration deficits. (Tr. 15, 18-20.) Rather, mental status examination findings consistently indicated fair attention and concentration, coherent and relevant speech, intact thought processes, and no loose associations. (Tr. 705-727, 730-733, 747-748.) Moreover, when Haslam took his

---

[8] Courts may review an entire administrative decision to determine whether an ALJ made sufficient factual findings to support his or her step three conclusion. *See e.g., Bledsoe v. Barnhart,* 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006); (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 412, 417 (6th Cir. July 15, 2014) (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison v Comm'r of Soc. Sec.*, 2017 WL 4124586 at * 5 (S.D. Ohio Sept. 18, 2017) (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, 2017 WL 1324609 at *2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

medications as prescribed, he reported improvement in his mental health symptoms, including improved concentration with medication. (Tr. 714, 722, 723, 720, 718, 714, 715, 716, 709, 748, 726, 731.) Indeed, in November 2014, Ms. Levine expressly noted that "client shared medications have helped eliminate symptoms of anxiety/depression, and he appears to be coping and handling life stressors." (Tr. 718.) Several months later, in January 2015, consultative examiner Dr. Dallara noted "[t]here was no direct evidence during the examination to suggest impairment to his persistence or pace" and stated "[h]e was able to track the flow of conversation adequately during the examination and did not show easy distractibility." (Tr. 699.) Dr. Dallara also indicated that Haslam "denied difficulties completing his work . . . or coping with work demands due to mental or emotional difficulties." (Tr. 697.) Moreover, the Court notes the results of Haslam's IQ testing were deemed "to be a valid estimate of his intellectual functioning due to his persistence and alertness for the duration of the testing." (Tr. 488, 545.)

Haslam highlights evidence indicating he is unable to function independently, including his hearing testimony that "he still lived with his mother; shared a bank account with his mother, which she kept track of for him; had to be reminded to complete his household chores; worked as a janitor part-time, a job that he obtained through the school; was unable to complete all of his required duties as a part-time janitor in a timely manner; failed the test he took in order to attempt to become a full-time janitor; could not drive; and had to have someone help him read his mail (Tr. 34-37, 42-44)." (Doc. No. 13 at 20.) The ALJ, however, placed greater weight on the normal mental status examination findings in the record, as well as Dr. Dallara's finding there was no evidence suggesting deficits in concentration or persistence. (Tr. 15, 19-20.) It was not error for the ALJ to do so. As noted earlier, the substantial evidence standard presupposes "there

is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at * 10 (E.D. Mich. March 1, 2018) (citing *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987)). Here, the ALJ's findings are within that "zone of choice" and thus supported by substantial evidence. *See e.g., Vecchio v. Comm'r of Soc. Sec.*, 2017 WL 2644129 at * 8 (N.D. Ohio Apr. 28, 2017); *Black v. Comm'r of Soc. Sec.*, 2015 WL 350573 at * 6 (S.D. Ohio Jan 26, 2015).

Accordingly, the Court finds the ALJ did not err in finding Haslam had a less than marked limitation in the category of concentration, persistence, or pace. In light of this finding, the Court need not reach whether the ALJ erred in finding a less than marked limitation in the area of understanding, remembering, or applying information. As discussed above, in order to meet the criteria of Listing 12.05B, Haslam must show a marked limitation in two areas of mental functioning.[9] Here, the Court finds substantial evidence supports the ALJ's findings of moderate limitations in concentration, persistence, or pace; and Haslam does not challenge the ALJ's finding of moderate limitations in the areas of interacting with others, and adapting or managing onself. Thus, even if the Court were to find that the ALJ erred in concluding he had a less than marked limitation in the category of understanding, remembering, or applying information, remand would not be required because Haslam still would have failed to show marked limitations in two areas of mental functioning.

---

[9] A claimant may also satisfy this part of the Listing by showing an extreme limitation in one area of functioning. Here, Haslam does not argue that he has an extreme limitation in any of the four areas of mental functioning.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in finding, at step three, that Haslam's impairments do not meet or equal the requirements of Listing 12.05B. This assignment of error is without merit.

### Treating Physician Dr. Parikh

In his second assignment of error, Haslam argues the ALJ erred in according less than controlling weight to the opinion of his treating psychiatrist, Dr. Parikh. (Doc. No. 13 at 20-25.) Specifically, he maintains his opinion should have been accorded great weight in light of the fact that "Dr. Parikh has treated Haslam since at least March 2014 and typically saw and/or reviewed Haslam's mental health progress notes every one to two months; Dr. Parikh was Haslam's treating psychiatrist and therefore was aware of all of his mental health impairments and the limitations caused by the same; and the record as a whole supports Dr. Parikh's opinions, including, but not limited to objective observations from mental status examinations, Haslam's ongoing subjective complaints, Haslam's testimony, and school records." (*Id*. at 22.) Haslam further asserts the ALJ erred by substituting his own judgment for that of Dr. Parikh. (*Id*. at 21-22.)

The Commissioner argues substantial evidence supports the ALJ's assessment of Dr. Parikh's opinion. (Doc. No. 15 at 16-21.) She notes the ALJ properly found that Dr. Parikh's opinion was inconsistent with his own treatment notes, which showed largely normal mental status examination findings and indicated improvement with medication. (*Id*.) The Commissioner further argues the ALJ correctly found that Dr. Parikh's opinion of extreme limitations was inconsistent with Haslam's daily activities of working part time as a janitor, managing personal hygiene, cooking, and cleaning. (*Id*.)

34

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[10]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[11]  Indeed, "[t]reating medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[12]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to

---

[10] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).  As Haslam's applications were filed in October 2015, the Court will apply the regulations in effect at that time.

[11]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[12] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, Dr. Parikh completed a Medical Source Assessment regarding Haslam's mental functioning on June 2, 2017. (Tr. 740-742.) Therein, he opined Haslam would have "noticeable difficulty (distracted from job activity) more than 20% of the work day or work week (i.e., more than one hour and up to two hours/day or one-half to one day/week)" performing the following activities: (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; and (3) interacting appropriately with the general public. (*Id*.) Dr. Parikh further found Haslam would not be able to perform the following activities on a regular, reliable and sustained schedule:

- Understanding, remembering, and carrying out detailed instructions;

- Maintaining attention and concentration for extended periods of time;

- Performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances;

- Sustaining ordinary routine without special supervision;

- Working in coordination with or proximity to others without being distracted by them;

- Making simple, work-related decisions;

- Completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;

- Asking simple questions or request assistance;

- Accepting instructions and responding appropriately to criticism from supervisors;

- Getting along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness;

- Responding appropriately to changes in the work setting;

- Being aware of normal hazards and taking appropriate precautions;

- Traveling in unfamiliar places or using public transportation;

- Setting realistic goals or making plans independently of others.

(*Id*.) Lastly, he concluded that, as a result of his impairments or treatment, Haslam would likely (1) be absent from work more than four days per month, (2) be off task over 20% of the workday, and (3) need to take unscheduled breaks more than four times per day, each lasting 15 to 30 minutes. (Tr. 741.)

The ALJ accorded Dr. Parikh's opinion "limited weight," explaining as follows:

On June 2, 2017, treating physician, Anil Parikh, MD indicated the claimant is unable to perform most mental work related tasks or functions on a regular, reliable, and sustained basis. He also indicated the claimant would miss more than four days

per month, would be off task over 20% of the workday, and would take more than four unscheduled breaks during the day (7F). This opinion is given limited weight, as Dr. Parikh's own treatment notes and the counseling records do not support this extreme severity of limitations. The notes consistently indicate normal mental status examinations, other than depressed mood and restricted affect, and they indicate improvement with medications. Further, this statement is entirely inconsistent with the claimant's daily activities of working part time as a janitor, managing personal hygiene, cooking, and cleaning.

(Tr. 20.) The ALJ assessed the following RFC: "After careful consideration of the entire record, I find that, prior to attaining age 22 and presently, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform unskilled (SVP 1-2) work. The work environment must be free of fast-paced production requirements and routine work place changes. The claimant can have occasional public contact and can do tasks with occasional interaction with coworkers. The claimant can have superficial contact with others, in that he can do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety of others." (Tr. 16-17.)

The Court finds the ALJ articulated "good reasons" for according only limited weight to Dr. Parikh's opinion. The ALJ rejected this opinion for the principal reason that it was inconsistent with Dr. Parikh's own treatment records and those of his supporting staff, which consistently documented largely normal mental status examination findings and improvement with treatment. (Tr. 20.) This reason is supported by substantial evidence. As noted *supra*, Haslam presented regularly to Dr. Parikh and his team of counselors between March 2014 and Dr. Parikh's June 2017 opinion. Aside from depressed mood and blunted affect, treatment records from these visits consistently documented largely normal mental status examination findings, including calm and/or cooperative behavior, good eye contact, coherent and relevant

speech, intact thought processes, no loose associations, fair attention and concentration, fair or

intact memory, and fair to good judgment and insight.  (Tr. 703-727, 730-733, 747-748.)

Moreover, while Haslam reported fluctuations in his mental health symptoms, the record reflects

he reported improvement in his mental health symptoms when he took his medications as

prescribed. (Tr. 714, 722, 723, 720, 718, 714, 715, 716, 709, 748, 726, 731.)  Indeed, in

November 2014, Ms. Levine expressly noted that "medications have helped eliminate symptoms

of anxiety/depression, and he appears to be coping and handling life stressors."  (Tr. 718.)

Dr. Parikh's opinion offers no explanation for these inconsistencies.  The Sixth Circuit

has found that inconsistencies between a treating physician opinion and his/her own treatment

records is a proper basis for rejecting a treating physician opinion.  *See e.g., Hill v. Comm'r of

Soc. Sec.*, 560 Fed. Appx. 547, 549-550 (6th Cir. March 2014) (finding ALJ properly rejected

treating physician opinion where that physician's treatment notes "did not support his opinion"

that the claimant had severe limitations and, in fact, "undermine[d]" his opinion); *Leeman v.

Comm'r of Soc. Sec.*, 449 Fed. Appx. 496, 497 (6th Cir. Dec. 6, 2011) ("ALJs may discount

treating physician opinions that are inconsistent with substantial evidence in the record, like the

physician's own treatment notes."); *Payne v. Comm'r of Soc. Sec.*, 402 Fed. Appx. 109, 112–13

(6th Cir.2010).  *See also Oglesby v. Colvin*, 2014 WL 1156239 at * 10 (N.D. Ohio March 21,

2014) (finding "the ALJ has clearly articulated his reason for giving little weight to the opinion of

Dr. Schmitt, that is, Dr. Schmitt's dire conclusions regarding Plaintiff's limitations are not

supported by his own treatment notes.")  Here, the ALJ specifically pointed to Dr. Parikh's

treatment notes in rejecting his opinion, finding his largely normal mental status examination

findings were inconsistent with his assessment of a wide array of severe mental functional

limitations.  In light of the above, the Court finds this reason to be supported by substantial evidence in the record.

The ALJ also rejected Dr. Parikh's opinion on the grounds that it is "entirely inconsistent with the claimant's daily activities of working part time as a janitor, managing personal hygiene, cooking, and cleaning." (Tr. 20.)  The Court finds this reason is also supported by substantial evidence.  Haslam testified that, for the previous four years, he had worked five hours per day for five days a week (i.e., 25 hours per week) as a janitor.  (Tr. 33.)  During his examination with Dr. Dallara, he denied any difficulties completing his work due to "mental or emotional difficulties."  (Tr. 697.)  Moreover, while he testified he was unable to pass the test to become a full time janitor, his supervisor described him as a "great asset to the custodial staff," noting he got along well with teachers, staff, and students.  (Tr. 452.)  With regard to household chores, the ETR completed when Haslam was in the 12th grade reported that Haslam "is able to perform many daily self-help skills independently including dressing, getting to school, cooking and eating."  (Tr. 452.)  During the hearing, Haslam testified he is able to wash the dishes and takes out the trash.  (Tr. 35.)

In light of the above, the Court finds the ALJ articulated "good reasons" for rejecting Dr. Parikh's opinion and, further, that those reasons are supported by substantial evidence.  While Haslam urges the Court to find that the reasons given by the ALJ do not constitute "good reasons," it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v.*

*Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is

not the duty of the district court, nor this court, to re-weigh the evidence. . . .")  Here, the ALJ

provided good reasons for her rejection of Dr. Parikh's June 2017 opinion and supported those

reasons with reference to specific evidence in the record.  Haslam's argument to the contrary is

without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**



  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 20, 2019